Our final case this morning is No. 14-1193, Cradle IP v. Texas Instruments. Now before we begin, before we start the clock, there are two matters here. The blue brief here argues a number of claim constructions which have nothing to do with the judgment here. That's not proper. You cannot do that. There was a proposal in Congress to allow that to happen. That was defeated. You can only argue things that affect the judgment, so we don't want to hear any arguments about claim constructions which have nothing to do with the judgment rendered by the district court here. Second of all, we're concerned about the confidentiality markings in the briefs, which are very extensive and border on being improper. And I'd like to hear from both counsel as to why these extensive confidentiality markings, including virtually all the expert testimony, exist here and whether they, in fact, can be removed. So why don't we hear with respect to that from Mr. Sabre first. Sure. Just on the claim construction point, I would just point out that what Your Honor said doesn't really apply to the 259 patent because on the 259… If there's a claim construction that affects the judgment, and I understand that with respect to the 259 there is an issue, we're not saying we don't want to hear claim construction arguments. We're just saying we do not want to hear claim construction arguments that have nothing to do with the judgment that was rendered here. Thank you. With respect to the confidentiality, I think almost everything that is confidential, that was marked as confidential, arises out of TI's confidentiality. So we don't have any problem with what could be said about it, but it was all about the TI check, which led to the confidentiality. Okay, well why don't we hear from Mr. Haslund then. Why is all of this expert testimony marked as confidential? It really raises serious questions of propriety. The reason is that, for example, with these patents, particularly the 259 patent, the accused devices and what is accused is deeply embedded in the interstices of the chip. And much of the description in the expert testimony, and this is a case where the appeal largely rests on whether or not there was evidence to raise the tribal issue of fact, that much of the evidence from the experts relates to the deeply inside the interstices of the chip, which is proprietary to Texas Instruments. For all of this, page after page, virtually everything that the experts say is marked confidential. It cannot be that those are all involving trade secrets. Did you do the confidentiality markings here? I reviewed them. I did not do them. I would suggest you get together with opposing counsel and see if you can reduce these confidentiality markings to the bare minimum so that someone reading this brief or writing about these issues can have some sense of what's really confidential and what's not confidential. We'll do so. Mr. Saber, why don't we begin? Thank you, Your Honor. May it please the Court. As the Court knows, there are two patents involved in this appeal, the 049 patent and the 259 patent. I believe the longer part of the argument will be on the 049 patent. If time permits, I will be commenting on a couple of issues on the 259 patent. Of course, to the extent the Court has questions about that or in response to anything that Mr. Haslam may say, of course I may comment further. The principal issue upon which the judgment relies for the 049 patent was this issue as to whether the software must be installed to have infringement of the apparatus claims. I believe that when we start with what was invented by Cradle and what is actually claimed in the apparatus claims, we think that the Court erred below and that the answers clearly know that the installation of software to run the claim semaphore circuit in the combined mode is not necessary. What Cradle invented was a system on a chip. Cradle spent years developing the chip architecture, the actual configuration of the chip, the actual design of the chip. The functionalities that are reflected in the claims are the things that are actually, is the configuration of the chip itself. That's what was invented. If you have the configuration of the chip itself, how do you have a configured chip if you don't have software that undertakes or performs a configuration? Certainly, on the method claims, that would be exactly right. To actually perform, to have the chip actually perform the functions, then you would need the software. I think that's completely correct. But these claims, the claims in this case, are apparatus claims just to the configuration. Doesn't the apparatus have to be configured a certain way according to the claim? The apparatus has to have certain things in its architecture, that's correct. And that's exactly what the TI chip has. But it can't do anything without the software, right? It can't perform the functions as described. That's correct. Isn't Nozomi pretty much on point about that? He distinguishes all the cases that you rely on and then you ignore Nozomi's distinction of those cases and act as though Nozomi didn't exist. Well, I think Nozomi was correctly decided. The distinction between Nozomi and Silicon Graphics, which I do believe are the two major cases that need to be discussed here, is what was the claim? In Nozomi, the claim is to a CPU. And the claim itself specifically says that the CPU has an execution unit to execute instructions of a plurality of instructions. That, to me, is the key to Nozomi and why Nozomi is correct. Of course, it's about the processor and about how the processor processes information. And in that kind of claim, clearly you wouldn't need to have the software installed to do that. And that's why I think Nozomi was right on point and right, right. It's just not this case. This case is much, much more like Silicon Graphics, where this court, dealing with really the same issue that this court just raised, is, gee, it doesn't actually perform the function. No, that's not what Silicon Graphics said. If you look at Nozomi at 1344, we distinguish Silicon Graphics as being inapplicable because it's talking about functioning in a particular environment. That's not the situation here. That's correct. That's what this court said in Nozomi. It talked about the specific environment. But when we look further and look at the claims, and I do think, Your Honor, that actually examining the claims, the principles are correct for both Silicon Graphics and Nozomi. But what the real difference is, is the claim. The claim in Nozomi is, say, easy processing. It's about processing. The claim in Silicon Graphics, where this court said, it's okay that it doesn't perform. In Silicon Graphics, it was just a basic operating system. Correct. It was assumed to operate in that environment. Here, you're talking about very specific software, which is necessary for the chip to perform the function. Correct. And if we had written claims that claimed that, you know, the claims in this case say not a word about software. It only talks about the… The claims talk about being able to do something, which can't be done without software. They talk about a chip that has the configuration to be able to do something. That's all the claims say here. In fact, if you look, you're completely correct, Your Honor. It claims a configuration to monitor shared resources, a configuration to be in state one and state two, and I won't go through all the states, a configuration to be able to generate an interrupt signal. That's all that's claimed. And that's very important because that's what our clients invented. They went away from the typical kind of chip and went to a chip that has the configuration itself, that has a function in there. And, you know… They can't do it without the software. Well, and that's, I think, really getting into the difference between a method claim and an apparatus claim. Yeah, certainly you need it to be able to do the function. When I look at the claim one, let's look on the 049 patent, lying around 60, it says a semaphore cell coupled to the first and second processors via system bus and configured to have a first state and a second state. So if you're saying this is an apparatus and we put that apparatus in a box ready to go, then according to this claim, that apparatus sitting in the box is configured. Well, it has the… Again, what was claimed in claim one. It's configured in the box, isn't it? The chip has to have that configuration. That's correct. And it's only software that can achieve that configuration. That's where I disagree, Your Honor. It's not the software. It's the software that allows the chip to actually perform the function. That's correct. But that's not what this claim is. How can it be that when you said it's configured to do this and it can't do it, then how can it be infringing? Because I think this court has already said that if you have a… Apparatuses can be claimed in functional terms, but that doesn't make it into a hybrid claim. That's what this court said in the RAAC case. And I think this is the kind of case that's just like that where it's only talking about the chip itself. It seems like you're arguing that configured means capable of being programmed to do something, not configured to do it now. But if that's what you would claim, then you should have used that language, not configured to do X. It has to be able to do X. The infringing product can't do X without further programming. Right. On the last thing Your Honor said, I completely agree with that. But again, the claim is just to the chip. Software is… It's not just to a chip. It's to a chip configured to do X. Well, configured… If you didn't want it to be limited in that regard, you shouldn't have put that language in. It's configured to be in state 1 in state 2. It's configured to be in state 3 in state 4. It's configured to be in state 5 in state 6. But their chip isn't configured to do that unless it's further programmed. Right. Well, again, I know we're going a little bit round and round on this. I believe that the distinction is their chip is configured to do those things, but it doesn't actually do those things until you put the software on. In any event, to just mention briefly… So, hypothetically, if your claim was configured to do a whole list of things, 1 through 100, and they had some kind of chip that if you put enough software programming on it, it could do 1 through 100, that would infringe? No, I don't think so. There's a distinction. If you just had a generic chip, and then you had to add all the software on, that's a very different kind of case. And that's why I started, Your Honor… But they have a chip that doesn't do what your patent claims without adding on. I would… You agree with that, right? They have a chip that doesn't do what your patent claims without the addition of additional software. I believe, actually, it does do what the patent claims because what Cradle invented is a chip where you have a specific architecture of the chip. You can't do the things that are described in the claim without the software. Well, that's true, of course, Your Honor. And, you know, I completely agree with that. You claimed just a chip architecture. You claimed a chip configured to do X. Configured to be able to do X would be probably the better way to say that. But you didn't write it that way. Well, I think that's the way you should… The claim should be understood because it doesn't say that it actually does it. That's what a method claim does. In an apparatus claim here where it's really… This is about the specific way you make the chip work. But let me move on. I understand… I have a question about 049. The question is whether, with respect to, I guess, the Series 4, Series 5, whatever it is, putting aside the claim construction, which I think only affects the Series 3, right? This is on which patent? 049. I mean 259. I'm sorry. Right. The question with respect to the Series 4 and the Series 5 is whether there's an automatic idle mode in here, right? That's one of the issues that's involved in 4 and 5. That's correct. But those can't infringe unless there's an automatic idle mode or there was proof that the users activated the available idle mode, right? Because it depends upon which one of the MTCs we're talking about. Because there's four MTCs that are dealt with in our brief. With respect to two of the MTCs, the EMIF and the DMM, the evidence we believe, Sheldon, that this was fact-finding by the judge, which was improper, that the functionality is actually hardwired into the chip itself. Does it have to be enabled? If it's hardwired in, it's automatically enabled as soon as it's used. So, in other words, when someone… In other words, the functionality… The testimony to that effect is at 5927, right? Paragraph 18 of your expert report? It depends which one it is, but sure. I think the testimony exists with respect to both the TMIF and the DMM. Right. Because the EMIF was principally based on TMI's technical documents, which talk about its gating. And we just think that the court ignored that. Well, the technical documents don't show anything because you're asking us to read the technical documents as though they were in English, and they're not, and we can't understand them. You've got to rely on your expert. Right. And the only expert testimony that I could find that addresses this question is paragraph 18 on 5927. Just give me a moment on that, Your Honor. You see the confidentiality problem, right? According to you, we're not supposed to be able to discuss this. On the EMIF, 5928 to 29, that's correct, Your Honor, for the EMIF. 5927, paragraph 18, right? Well, my notes have it 5928 to 29, where... I don't think so. Yeah, 5927. Right, where he talks about why the EMIF is set by hardwiring. I think he also gets into it, and I don't have the paragraph number here. I'm sorry, Your Honor, but it's on 5928 to 29. He also discusses that issue. Well, I didn't see on 28 and 29 any reference to it being enabled. Right, but again, I know that our expert looked at the documents, interpreted the documents. I think you're exactly right, Your Honor. That's why we should have had a trial, and he says, I understand what this document is teaching, and this document is teaching that the functionality is hardwired in. Because it's always enabled. Correct. Is there any other testimony besides this that suggests that as to these four, it's always enabled? Because I only see that testimony existing with respect to these two items. Yeah, and I believe that it also relates to this whole smart idle and dynamic dependency issue, because the argument here, there's no doubt that customers enable the smart idle. TI says, well, this dynamic dependency also has to be enabled. But the TI documents themselves, as our expert discussed, talk about the fact that for certain of the MTCs, the dynamic dependency is always enabled. And what does that mean? That means that there's a fact dispute here. What I'm saying to you, and to address this specifically, I see that testimony existing in paragraph 18 here with respect to two of the four. I do not see any other testimony that contradicts Texas Instruments' position with respect to the other two, that they were not enabled and needed to be enabled in order to work. Oh, for the other two? Yes. I believe on the smart idle dynamic dependency, that's where I was going, is I think that there is also the evidence there. It's principally about the documents. Yeah, principally about the documents, which cannot be understood. Correct. And then in his report— Wait, don't interrupt me. I'm sorry. Which cannot be understood without expert testimony. I do not see expert testimony with respect to the other two items. Right. If I could refer the court to 5925-26, where I think in the context of that discussion, the expert also says that the dynamic dependencies are always enabled. Where does he say that? Thank you. In the middle of paragraph 15, for example, in OMAP—well, I'm not sure what I'm permitted to say here, but I'll refer the court to the middle part of that paragraph. For example, in OMAP, there is a dynamic dependency that's always enabled. Correct. Correct. And I think there's a second reference to it a little further down in that paragraph. How is that different from paragraph 18? He's probably just talking about different MTCs, and this was in— Well, how is it talking about the other two that we're talking about here? How can I tell that he's talking about the other two? Well, this one here on paragraph 15 talks about the GPMC in particular. And then above—this paragraph is about the GPMC, which is one of the ones that has to be set. And the discussion of SmartIDLE is actually a more general discussion about, rather than pointing to a specific MTC, it's more the way that it works, so it would apply as well to the GPMC and just more generally. But it's the same issue in paragraph 15 here refers to the GPMC in particular. Okay, I understand. And then the EMF one goes as well. Okay, I think most of my colleagues have questions. We're out of time. We'll give you two minutes. Thank you, Your Honor. Mr. Haslund? Yes. Briefly with respect to the 049, Pat. Why don't you begin with the 259 since it's fresh in our minds here and address the parts of the expert testimony that the counsel is relying on as to why that doesn't play the fact issue as to whether these are always enabled. First of all, I think one of the points in Judge Robinson's opinion, which I think was very important to her decision and I think is very important here is, in determining whether it's a tribal issue or fact, one not only looks at the attorney's arguments and what the expert says, but one looks at what the expert relies on to support what he says. And time after time here, as we pointed out to the district court, what the expert says isn't supported by the evidence on which he relies. And that is specifically the case with the EMIP and the DMM. If you look at the record evidence that the expert is relying on, it's the testimony of a TI engineer when asked with respect to these modules, is it hardwired? He said it may be, but I would need to check the code. That's all. Where is that testimony? That testimony is, and I apologize, Your Honor, it is cited in the references to our brief. I'll find a site to it. But if you look at the testimony that the expert cites, it is to that depth. Where is he citing the testimony? I'm looking here at paragraph 18 on 5927 and I can't tell what it's citing. If he's not citing anything, then he's making it up. It's apparently a document. That document, there are technical reference manuals, and one of them is at JA 18. You say he's relying on this engineer's testimony, which doesn't support it. How do I know that? Because I don't see on this page, with respect to this testimony, that he's relying on some engineer's testimony. There is testimony cited in our brief. I apologize for not having it. Can I ask you, this is all baffling to me, but looking at paragraph 18, this is what you're talking about, right? Are these sites to record things? Can I say these? Yes. Are those the citations you're talking about? Well, I'll talk about those citations. We cited also the testimony. Those are sites to documents, not to testimony. Let me talk about the documents. Is that correct? Yes. The documents that he relies on state, and this is contained in our brief at page 39, quote, the E-MIF can gate off the E-MIF F-Clock. There is an internal mechanism which can stop the E-MIF F-Clock automatically. If you look at that document, and one of those documents is at JA 1874. It's a technical reference, TA 1874. 1874. Which volume is that? I believe that's in volume one. It's in volume two. I apologize. It's in volume two. Also, you did not put 1874 in the appendix. I apologize. It's 1847. Oh, okay. I apologize. It begins at 1834. It's a technical reference manual. Okay. The section we're talking about is, I think, in the PRCM, which is the power reset and clock management portion. You'll find, I think, on 1847, the quote that we cite in the brief, which is in the documents that the expert relies on. If you look at the very next entry, first of all, the F-Clock is only one of the clocks in the E-MIF. There are other clocks in the E-MIF, and the court didn't address this in its motion, but it did refer to the fact in discussing it, that there is a clock that it remains on in these devices. There is an ability to turn off some of the clocks. Okay, but let me tell you what the problem is here. It's really hard for us to read these documents. We're not engineers. We need to see testimony, somebody from your side, who explains that this document doesn't mean what their expert says it means. If you look at the second bullet point, under what the expert refers to. The second bullet point? Which bullet point? I think where, on 1847, it says, it has the quote, the E-MIF can gate off the F-Clock. Yeah. The next entry says that it can gate it off only when it's in refresh mode and the L3 interconnect is off. Is power down, idle, is off. This is gibberish. We can't understand this. Judge Robinson went through that and found... Well, she's not an engineer either. Maybe she has an engineering background, but she's not an expert. Where do you have a reputation of the appropriateness of relying on these documents for the point that he attempts to make? If we look at page 39 in our brief, right, we cite to the evidence that says that the E-MIF, ability to turn itself off, is controlled by the PRCM. The PRCM is an external agent which controls the ability of the E-MIF to turn itself off. Which is not enabled. There's testimony that it's not enabled. That it's not enabled, and therefore, the ability to turn itself off... How do you relate this to that? In other words, the E-MIF... How do you relate the E-MIF to the... PRCM? PRCM. It's a testimony. The second bullet point indicates that it can only... There are many bullet points. Well, the second entry under the one that says the E-MIF can gate off the E-MIF F-Clock says that it can only do that when the memory is in refresh mode and the L3 interconnect, which the record reflects, is what connects the E-MIF to the processors that write to it, is in power down idle mode. And that's what is controlled by the PRCM, which is the citations on page 39. Did your witness say that? Did your expert say that? Yes. Where? It's cited in JA 1953, 270, 19, and 271. These are citations that are contained in page 39 of the red group. Which volume is 1953? Two? Two. Okay, so where is it? JA 1953, 270, 19 to 271, 5. And then there's another cite, unfortunately it's in the third volume. What am I supposed to get out of it? That the PRCM controls the E-MIF. And that JA 6567... Where does it say the PRCM controls the E-MIF? The statement that that will be based on the idle request coming from the PRCM? Yes, that's the idle request we're talking about. Okay, and where's the other reference? It's in the third volume, unfortunately. It's JA 6567-68, paragraph 459. Can you tell me again, I'm sorry, but this is what the consequence of the PRCM controlling the idle request is? It basically... The PRCM, I think, is not enabled, is the argument. Okay. Right, I don't think there's any dispute that the PRCM, when it is shipped, is disabled. So your argument is, because the PRCM is the one that would do what their claim does, and it's not enabled... For the E-MIF, that's correct. There's another issue on the PRCM clock gating, which is that their static dependency is enabled. So you agree that 271, I would talk about the idle request coming from the PRCM on lines one and two, but I assume you would also say, a little further down, there's a question at six that the clock gating is under the supervision of the PRCM, correct? And the answer is A, that is correct. Yes. Okay. And the PRC... So the E-MIF cannot turn itself off. The document the expert cites to says it can, but it can only do it when the PRCM tells it to, because the PRCM is what shuts down the L3 interface. Okay, I understand. What about the DMM? The DMM, there is no evidence, I don't think, other than the conclusory statement of an expert not supported, that the DMM has the ability to turn itself off, other than some statement in the OMAP3 device that said it had that ability, and the attorney argument is, well, because it was in the OMAP3, it must be in the OMAP4. And that's attorney argument. There's no expert testimony to say that. And if the court has other questions on the 259, I'd be happy to answer them. I don't know whether the court has one issue. I do want to just discuss about the OMAP3, which was not an issue that Judge Robinson ruled on, but is based on a claim construction that she ruled on and a stipulation of non-infringement based on that claim construction, and that's the idle memory transfer control. And just briefly, this is a case, I believe, where the inventors were their own lexicographers. If you look at the specification in Column 5, they define in terms of using the parenthetical IE, which this course in Edwards Life Sciences has said can be a signal that they intend to define it. They define an idle memory transfer controller specifically with respect to particular bits, the one bit, the external rate, and the XW bit that the court found. Elsewhere in the specification, it is supported repeatedly that that's what the idle memory transfer controller does and is. The one thing I want to indicate is that I'm sure if the court looked at this claim construction initially, it thought it was fairly specific when it got down to not only the particular bits, but the values in the bits. The values in the bits don't make any difference to the appeal because they stipulated non-infringement, which is both literal and doctrinal equivalence. They didn't stipulate just not being able to prove literal infringement. So the values, whether they were changed from 0 to 1 or 1 to 0, is irrelevant to sustaining the judgment. But this is a case, I think, if you look at the specification in Columns 4 and 5, numerous times they specifically say what is the state of the bits and those three important bits in determining what an idle memory transfer controller is and how it differentiates it in Figure 4, for example, from the other states in which the transfer controller can be in. I'd like to say just one thing with respect to the 049 patent. I think the court is right. This is controlled by Nozomi, Typhoon Touch, those line of cases. The one thing I would say is in the evidence in this case, different than many of the other cases where circumstantial evidence is relied on, there is affirmative evidence in this case that Ty's customers, in fact, do not use the hardware semaphore module at all, let alone do they program it in one of the three methods which is accused of infringement. And I think that's dispositive of both the method claim and the claim that the device is ever configured. Finally, the notion... What about the use during that presentation? The demonstration? First of all, there is absolutely no evidence in the record, no expert testimony and no evidence in the record as to what configuration the device was in for that particular demonstration. There was a question to the engineer, and the engineer clearly was not testifying in terms of the claim limitations and simply said that they demonstrated it in combo mode as well as the other three modes. But if you look at the slide deck that was used, it was simply to catch and release the semaphores and to see how fast in each of them you could catch and release the semaphore. What's missing is any mapping of the demonstration and the software that was used in the demonstration to the claims. And that's particularly telling here, I believe, because that code was produced to Cradle, and while Cradle in several other places attempts to rely on their experts' reading of the code, sometimes erroneously they rely on code where the experts have to guess or speculate what it is. In this case, that expert put in no testimony as to what the code did. And what's missing, for example, is any mapping or monitoring of the shared resources to the semaphores. What's missing is the need for the semaphores, for the shared access to be accessed for the various semaphore interrupt cell, for the semaphore cell and the semaphore interrupt enable cell, which all have states which are associated with shared resources. The shared resources weren't there, and because the shared resources weren't there, Method Claim 6 wasn't practiced because one of the elements of Method Claim 6 is that after getting the semaphore, indicating the shared resources available, actually accessing the shared resource, and there was no shared resource here. There was no evidence from what the code was as to what was used. There's simply the expert referring to the testimony that says I demonstrated in these three modes simply how fast you could access the semaphore in 100 times and then tell me what the average times were. So I don't think that evidence raises a tribal issue. In fact, if the jury had that, they would be purely speculating on what was the configuration during that demonstration. Okay. Thank you, Mr. Haslam. Mr. Saber, you have two minutes. Just three points. First, with respect to the claim construction issue on 259 that Mr. Haslam discussed, the stipulation of non-infringement in this case for the OMAP 3 was for the entirety of the court's interpretation. So if any part of the court's interpretation goes out, then the stipulation, it doesn't apply. It's only to the entirety of the court's construction. That's why we're appealing it. And frankly, I do think that that was one of the best examples of where the court really just took the preferred embodiment and put it into the claims. There are other claims in the 259 patent that talk about activating the MTCs through using run bits or through using start logic. The claim 1, which is what this is about, is only about the fact that the MTCs are activated, not how they are activated. She put the whole how from the preferred embodiment into the claim. That's why we think they were error. The discussion that the court had with Mr. Haslam about the evidence of the record I think really kind of proved the point as to why there's just a fact dispute. Our expert, and we talked about some of them, and I was able to find the other references to where he talks about why interpreting the TI technical documents and why it supports our position, I would also refer to paragraphs 21 and 22 on 5928 to 29, and he refers back again to his earlier part of his initial report, which were paragraphs 139 to 145, which I believe we can find at 4225 to 4227. And that's a detailed discussion by our expert as to why looking at the TI documents, why he believes that the appropriate either hardwiring or settings have taken place. This is a classic fact dispute, and their expert may have a different view, and that's fine, but that's really why we should have a trial on the 259 patent. Thank you, Mr. Sabra. Thank you very much. Thank both counsel. The case is submitted, and that concludes our session for today. The final report is adjourned until tomorrow morning at 10.